PUBLISHED

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **19th** *day of* **April, 2022**.

Michael Haas, Petitioner,

 against Record No. 0878-20-2

Commonwealth of Virginia, Respondent.

Upon a Petition for Writ of Actual Innocence

Before Judges Russell, AtLee, and Senior Judge Haley

Michael Haas filed a petition on July 30, 2020, seeking a writ of actual innocence under Chapter 19.3 of Title 19.2 of the Code of Virginia. In a bench trial, the circuit court convicted him of forcibly sodomizing his sons, A.H. and L.H., who were eleven and nine years old, respectively. By final order entered July 22, 1994, the Circuit Court of Powhatan County sentenced him to two terms of life imprisonment, to be served concurrently.

Haas asserts that he is actually innocent of the offenses because expert consensus has evolved since his convictions and "under current standards," the physical examinations of his sons "reveal . . . no indicia of sexual abuse." He also asserts that new scientific evidence both validates his sons' recantations and shows that their accusations and trial testimony "were unreliable and invalid."

Upon review of the petition, the Commonwealth's response, Haas' reply, the exhibits submitted with these pleadings, the record, the findings of fact certified by the circuit court under Code § 19.2-327.12, supplemental briefing ordered by the Court, and a joint evidentiary submission of the parties, we grant Haas' petition.

BACKGROUND

I.  Trial, appeal, and *habeas* proceedings

In 1992 and 1993, Haas lived with his then-wife, Elaine, A.H., L.H., and his daughter, J.H.  J.H. had her own bedroom and the boys shared another bedroom, each with a twin bed.  Because Haas and Elaine were "continuously fighting," Haas slept about five nights a week in the boys' bedroom.

A.H. testified that beginning in the summer of 1992, Haas "stuck his penis up [A.H.'s] butt."  A.H. said Haas did this "[o]nce a month" for a total of "[f]ive times."  A.H. said that afterwards, he had trouble going to the bathroom and "messed [his] pants."  A.H. said that to deter Haas, he surrounded himself in bed with stuffed animals, had the family dog sleep in bed with him, and slept in his clothes.  A.H. said that during "[t]he same year," Haas slept in L.H.'s bed, too.  A.H. sometimes saw "[s]omebody's body" move "[u]p and down" when Haas slept in L.H.'s bed.  A.H. said that one day after Haas slept with L.H., L.H. complained that "[h]is butt hurt."  A.H. said he initially did not tell L.H. or anyone else what Haas had done to him because he was afraid of Haas.  A.H. said Haas told him "[n]ot to tell anybody because it would probably split [the] family apart" and that if A.H. did tell, Haas would "get him."  Haas also had hit A.H. with a belt, and A.H. had seen him hit J.H., too.

L.H. testified that Haas slept in his bed "lots of times."  L.H. said Haas "took his private part and stuck it up my – my rear" "lots of times."  L.H. said Haas continued doing so until the summer of 1993.  L.H. said that he pushed his mattress up against the adjacent wall so he "wouldn't fall in the crack between [it and] the bed" while Haas was "[p]ushing [him] against the wall" when Haas' penis was inside him.  L.H. said that although it hurt, he "didn't scream that much out loud."  He made "[l]ittle screams" "[l]ike crying" and told Haas that it hurt.  L.H. said that he suspected Haas did the same thing to A.H. when Haas slept with him, but L.H. never discussed it with A.H.  L.H. said he never told A.H. what Haas did to him because he "was scared [Haas] was going to kill" him.

Elaine testified that she was initially unaware that Haas was sexually abusing the boys, but she made several observations that corroborated their testimony.  In the summer of 1992, Elaine noticed that A.H.

started having the family dog sleep in bed with him. She said that A.H. later told her that he slept with the dog because it kept Haas from getting into his bed. At about the same time, A.H. was "messing in his pants a lot." She also observed that L.H.'s mattress was shoved against the adjacent wall. When she asked L.H. why it was in that position, he told her that he "didn't want to fall in the crack." She found blood in the middle of L.H.'s mattress "on a couple of occasions." At the time, she assumed either Haas or L.H. had a cut. Between December 1992 and March 1993, L.H. began occasionally smearing his feces on walls. He also started having trouble in school.

Elaine took the children and moved to her parents' house in December 1993 because of Haas' increasing domestic violence. She testified that he would throw furniture at them and beat the children. Elaine began taking the boys to a counselor named Susan Boyles; on Boyles' advice, Elaine refused to let Haas see the children. As a result, Haas filed a petition for visitation. Elaine testified that on the Friday before a court hearing the following week, Boyles told the boys that they would be spending weekends with Haas. According to Elaine, the boys panicked because "they didn't want to go visit their dad, especially to spend the night." That same night, L.H. told her for the first time what Haas had done to him. A.H. testified that L.H. told Elaine that Haas "had been doing it to [L.H.]." When Elaine asked what that meant, L.H. said that Haas had "been molesting" L.H. A.H. confirmed that L.H. used the word "molested." A.H. said he himself then left the room and went to bed, but that he told Elaine the next day what Haas had done to him, too. According to Elaine, the boys said they had remained silent because Haas "threatened to kill [her] if [they] told."

L.H. testified that he told his mother that Boyles "told [him] that [Haas] probably did something to [him] when [Haas] slept with" L.H. L.H. confirmed that Boyles made that statement to him before he had told her or his mother about any abuse. According to Elaine, Boyles told her that J.H. reported seeing L.H. position two G.I. Joe toys "like two men making love." L.H. confirmed that Boyles asked him about this incident. According to L.H., that was when Boyles told him "that [Haas] did something to [him] when" they slept together.

A.H. testified that Boyles asked him if Haas "has been doing anything weird to [him]" but A.H. denied it. She told him that if Haas "has been molesting you, just tell somebody." According to A.H., Boyles then told him that Haas himself had told Boyles that he had molested the boys. A.H. confirmed that, regardless of Boyles' actions and statements, Haas had in fact "put his penis up [A.H.'s] butt."

Elaine testified that after the boys' revelations, she reported the accusations to Powhatan County Sheriff's Detective Gregory Neal. Detective Neal separately interviewed Elaine, A.H., and L.H. Detective Neal thereafter arrested Haas in the presence of counsel. Haas denied the charges and said Elaine "has to be evil, that they were brain washing the kids." Haas also asked Detective Neal to have the boys medically examined.

L.H. and A.H. were subsequently examined at the emergency room of the former Medical College of Virginia ("MCV"). Dr. Jil Ryland, then a second-year pediatrics resident in MCV's emergency room, examined L.H. and testified as an expert witness without objection. Ryland testified that she had seen between twenty and twenty-five child victims of sexual abuse. She had also been trained "on the physical exam and physical findings that are abnormal" by Dr. Berrond, a "sexual abuse expert" at MCV. She sedated L.H. for the examination because he was scared. Referring to photographs taken during the examination, she identified "old healed tears . . . at 12, 10 and 2 o'clock" as well as "a loss of anal puckering . . . from 10 to 12 o'clock." She also identified loss of puckering "from 4:00 to 8 o'clock." She noted "a jagged appearance to the anal opening, which is abnormal, it should be circular or elliptical. It's very jagged from the old healed tears." "A rectum would be circular or oval in shape, not jagged with these old healed tears."

Ryland also noted "funneling, indicating repeated penetrating, something penetrating repeatedly causing a scarring in the area and a funnel appearance around the anus. And there's also venous pooling in that area, and it becomes congested, it turns kind of a purplish color to it." She opined that "[t]his was chronic, this was repeated and not in the past couple of months." She denied that the tears could have been caused by "a normal body function" or "a substance exiting the anus." To the contrary, she testified, "[i]t had

to be a penetration from the outside, some penetrating object in a chronic nature." She concluded that "[i]t's consistent with sexual abuse."

On cross-examination, Ryland confirmed that she was familiar with "the book written by Hobbs & Wynn on the sexual abuse of children." Counsel questioned her about the "triad of . . . signs that would be confirmatory with frequent anal intercourse." She confirmed that she detected the first sign, "thickening of the anal skin with reduction or obliteration of . . . skin folds." She admitted that she could not confirm or deny the other two signs, "[i]ncreased elasticity of the anal sphincter muscle" and "reduction of the power of the anal sphincter muscle," because she did not perform a rectal exam, which "we normally don't do when we look at these children." She denied that L.H. had any underlying medical conditions that could have caused the healed trauma she identified. She also agreed that L.H. had been in a prone position when she examined him and that venous pooling and anal dilation could be seen in unabused children who were maintained in a "prone knee-chest position for five minutes."

Dr. David Marcello, an attending pediatrician in MCV's emergency room, observed L.H.'s examination by Ryland and also testified as an expert witness with Haas' stipulation. Referring to the photographs of L.H.'s examination, Marcello, too, identified

> a ragged appearance to the rectal anal area. It has an uneven pattern to it.
> There is evidence of decreased tissue wrinkling or folds.
>
> There is evidenced loss of subcutaneous tissue between 7 o'clock and 2 o'clock. There is evidence of tears at 10 o'clock and 2 o'clock and 12 o'clock. There is evidence of venous congestion.

He also opined that "[t]his has been chronic abuse" "because of the funneling and because of the decreased tissue folds and the scarring that looks as well to be old." He denied that the injuries shown could be caused by "the elimination of body waste," instead insisting that they would result from "[a] penetrating trauma to the rectum in the anal area, it would not be consistent again with something coming out from the body . . . . It would be a repeated foreign body."

Dr. Dinea Desouza, another second-year pediatrics resident in MCV's emergency room, examined A.H. and testified as an expert witness without objection.[1] Desouza was also trained in sexual abuse cases and had seen between twenty and twenty-five victims of suspected abuse. Desouza identified three abnormalities when examining A.H. The first was "decreased radial folds of the anal opening between 12 o'clock and 6, specifically . . . between 11 and 2, and 4 and 7." The second was "a large diameter of the anus," which she measured as two and one-half centimeters, compared to a normal size of two centimeters for a child A.H.'s age. She opined that the cause of "an increased diameter to the anus would be trauma, penetrating trauma specifically." The third was "markedly decreased sphincter tone" during an internal digital exam. She indicated that loss of sphincter tone would be "consistent with an inability to control elimination of body waste." She denied that the injuries she found were "consistent with the normal elimination of body waste" and in her opinion, the trauma would have to have originated "[f]rom the outside." On cross-examination, Desouza testified that she performed the digital examination with one finger and that she found no scars.

Dr. Robin Foster, a pediatrician on MCV's child protective team, also testified as an expert witness with Haas' stipulation. She had seen more than 500 children who were victims of suspected sexual abuse over the previous two years. She said that she had not physically examined either A.H. or L.H. but had reviewed the photographs taken during their examinations at the request of the other doctors. She agreed with them that A.H.'s photographs displayed trauma in the anal area "consistent with chronic penetrating trauma to that sphincter" "from the outside to the inside." L.H.'s photograph displayed "a markedly irregular rectal rim," "tunneling," and "a mild purplish discoloration because the subcutaneous veins have become more visible."

Susan Dodson, Elaine's sister, testified that, after Elaine and the children moved to her parents' house in December 1993, Dodson began receiving phone calls from Haas in the evening. She said that the calls

---

[1] Unlike L.H., there is no indication that A.H. was sedated for his examination.

initially began with small talk but "he would say [']do you think I did it.[']" At the time, Dodson did not understand what Haas referred to. The calls continued into January 1994, when Haas began asking her "[']what do you think, did I do it['] or [']did I do it, am I guilty.[']" And he would jump from one thing to the next. And he never really made any sense, his words were very slurred." Dodson said that in the final call, she could tell that Haas had "been drinking really heavy," because "his words were kind of slurred" but not "so slurred I couldn't make it out. He said [']hell yeah, I did it, I'd do it again, I screwed the kids, you can go to hell with the rest of them because you can't prove it.[']" On cross-examination, Dodson admitted that she did not know why Haas would call her, but suggested that he may have wanted her to intercede with Elaine on his behalf. Dodson said that she shared the substance of the last phone call with Elaine.

Testifying in his own defense, Haas admitted sleeping in his sons' beds "[o]nce maybe a month or once every two months, only when [Elaine] made [him] mad," but denied sodomizing them. He admitted to beating the children with a belt "[o]n a disciplinary basis." He said he called Dodson only twice, once for her to pick up the children's Christmas presents and once for her to pick up clothes for J.H. He denied calling her in January 1994 and denied telling her that he sexually abused the boys. He accused Dodson of making "romantic pass[es]" at him.

Haas also introduced a recording of a phone call J.H. made to his trial counsel, in which she informed counsel that she had talked to A.H. and A.H. denied that Haas had sexually abused him. At trial, however, J.H. testified that she spoke to A.H. after she made the call and he said that Haas had done it. J.H. said that Haas' mother, Ursula, told her to call Haas' counsel and gave her the telephone number. J.H. said Ursula promised to give her clothes and to take her to an ice show for making the call. J.H. said that she had not actually talked with either A.H. or L.H. about their allegations concerning Haas before she made the call. She said she talked to A.H. after she made the call and he told her that Haas "had stuck something up his behind."

Ursula testified that she spoke with J.H. on the phone in April 1994. According to Ursula, J.H. said that A.H. "had told her . . . his father never did anything to him." Ursula denied telling J.H. to call anyone else. On cross-examination, Ursula specifically denied telling J.H. to call Haas' trial counsel, promising her

money or clothes, or promising to take her to an ice show. Ursula said that the children were always happy when she saw them with Haas. Haas took them to sporting and scouting events. She last saw the boys before Thanksgiving 1993 and last saw J.H. at Christmas of that year.

Haas also called Dr. Robert Mitchell, III, a gastroenterologist, who testified that he had examined the photographs taken during L.H.'s examination. Mitchell said that he was unable to "tell anything from the picture to be honest with you." He opined that "there are folds which are present normally and if you look, it looks like the buttocks have been pulled apart by somebody doing the exam." When asked whether he could determine whether the photograph showed "any evidence . . . of external penetration of the anus," Mitchell replied that he could not determine "from the photograph[] anything about whether or not there's been anal intercourse. . . . [I]t is not that much help to me really." Mitchell also admitted that although he had been consulted on cases of anal abuse, he had never testified in a child abuse case before. On cross-examination, he opined that the photograph did not appear abnormal from an adult perspective but that he was not a pediatrician, so he did not "have any knowledge about a ten year old child." He also acknowledged that he "d[id] not consider [himself] an expert in this field."

The circuit court found that "[t]he testimony of Dr. Mitchell . . . was really not very persuasive." It noted that Mitchell "admitted not to be an expert in this area" and "said that he couldn't tell [anything] by the picture." By contrast, the circuit court found,

> [t]he testimony of Dr. Desouza, Dr. Ryland, and Dr. Foster was . . . powerful testimony. Those witnesses are . . . trained physicians that have examined many, many children for evidence of sexual abuse and testified unequivocally as to the result of their examination, and these pictures here do speak volumes in my opinion.
>
> [I]t would be much more difficult for me to decide had I not had the testimony of these four [sic] witnesses supported by the pictures. And so it's not just the pictures, it's their testimony, they saw it. They felt[,] in the one case, the rectum of the victim and they saw it close at hand, they made [considered] judgments that really are not refuted and certainly are entirely supported by these pictures, which to me are very graphic of abuse.

The circuit court also noted that it "didn't get [the] impression" that Elaine was "one who wants to put her husband away" to affect the outcome of divorce proceedings. It saw no "effort [by her] to embellish testimony in any way." It also found that Dodson's testimony "was obviously very damaging, and her statement that [Haas] called her up and made these statements that we have heard incriminating himself, was largely uncontradicted and unexplained." It expressly rejected Haas' indication that Dodson had "come on to him."

Finally, commenting on the victims' testimony, the circuit court found that

> their testimony did have some inconsistencies. I would recognize that, but . . . normally you don't hear the testimony of small children[,] ten and 12 year old children, traumatized and victimized[,] brought to court and made to testify and scared[;] they have divided loyalties.
>
> They have a father and the mother on the other side and they are in a strange place[,] reluctant to testify. They don't want to testify, they hesitate, but they do tell things occasionally that are a little bit difficult. I wouldn't be surprised if that was not the case in this sort of a context.
>
> They were scared and worried, they are children and I would suspect their testimony to be pretty much as it came out here today. There was no equivocation, there was no hesitation, both of them said their father, as awful as it might be and as [it] is, yes, their father did put his penis in [their] rectum[s].
>
> And I believe it.

Accordingly, the circuit court found Haas guilty of both charges and sentenced him to a term of life imprisonment on each.[2] Haas appealed to this Court, which denied his petition. *Haas v. Commonwealth*, No. 1591-94-2 (Va. Ct. App. Oct. 10, 1995). The Supreme Court of Virginia refused further appeal. *Haas v. Commonwealth*, No. 951987 (April 10, 1996). Haas filed a petition for a state writ of *habeas corpus* in the Circuit Court of Powhatan County, which denied it as untimely. *Haas v. Lee*, No. CL00000041-00 (Va. Cir. Nov. 8, 2000). The Supreme Court affirmed the dismissal. *Haas v. Lee*, 263 Va. 273 (2002).

---

[2] Haas was released on parole in 2017 and is registered as a sex offender.

-9-

Haas filed a petition for a federal writ of *habeas corpus* in the United States District Court for the Eastern District of Virginia claiming, among other things, that he was actually innocent principally based on an affidavit A.H. executed on December 22, 1999, in which A.H. recanted his trial testimony. The federal court rejected his claim and found that he was not entitled to equitable tolling of the one-year statute of limitations for federal *habeas* petitions. *Haas v. Lee*, No. 3:02CV572 (E.D. Va. Sept. 22, 2003) (unpublished). The United States Court of Appeals for the Fourth Circuit denied a certificate of appealability and dismissed Haas' appeal of the district court's judgment. *Haas v. Lee*, No. 03-7703 (4th Cir. Apr. 13, 2004) (unpublished).

## II. Haas' first petition for a writ of actual innocence

Haas first filed a petition for writ of actual innocence in this Court on May 11, 2010. *Haas v. Commonwealth*, Record No. 0984-10-2. In support of that petition, Haas proffered affidavits from A.H., L.H., and J.H. executed in October 2009[3]; Dr. Suzanne Starling, medical director of the child abuse program at Children's Hospital of the King's Daughters; and Dr. Jonathan Arden, a forensic pathology consultant.

In their affidavits, all three children averred that Haas was a strict disciplinarian who spanked them or beat them with a belt when they misbehaved, but all denied that he had ever touched them inappropriately or sexually abused them. All three children said that their siblings told them secrets they did not tell others, but that none had ever mentioned any inappropriate touching or sexual abuse. A.H. and J.H. said that Haas always slept in his clothes when he slept on the couch or in one of the children's rooms. A.H. and J.H. both said that before trial, Elaine told the boys that Haas "would be going to a treatment center to get help for his temper and drinking," "that after [the] treatments were finished, we would all live together again" and that "she never mentioned that [Haas] would have to go to prison." A.H. and L.H. each said that they were afraid that Elaine would punish them if they told the truth that Haas had not sexually abused them.

---

[3] J.H.'s surname changed by the time of her affidavit. We refer to her as J.H. throughout for consistency.

In his affidavit, A.H. averred that no one had ever discussed sexual abuse or molestation until Boyles raised the issue. He said that he was "confused by her concerns" and that L.H. "simply ignor[ed]" them. A.H. alleged that the boys' counselling sessions with Boyles "got to the point where all she did was ask questions about abuse and molestation" and that she "told [the boys] that [they] had been molested by" Haas. A.H. explained that he "testified falsely at [Haas'] trial because that is what [Elaine] wanted [him] to do", that she had promised A.H. "would receive a four-wheeler vehicle," which he in fact later received, and that he "answer[ed] questions in court the way [he] was supposed to answer as a result of conversations and counselling sessions with" Boyles and Elaine. Finally, A.H. said that he discovered that Elaine had received $25,000 from the prosecutor's son. In his affidavit, L.H. similarly averred that he "felt . . . that [he] was brainwashed by" Boyles and Elaine "to say false things about" Haas.

In her affidavit, J.H. averred that Boyles introduced the idea that Haas sexually molested L.H. According to J.H., Boyles told her that Haas "had sexually molested [J.H.'s] brothers," which was the first "indication of any molestation." J.H. said "[o]n a number of occasions, [Boyles] asked [her] questions which suggested answers that would accuse [Haas] of molesting [her] brothers." J.H. alleged that she overheard Boyles "telling [J.H.'s] brothers what to say about accusations of molestation by" Haas, that she overheard "a telephone message from [Boyles] on our family's answering machine requesting to see [A.H.] again because he did not believe the allegation of sexual molestation yet," and that Boyles "told [A.H.] that he would be in trouble if he did not cooperate with [Boyles and Elaine] regarding accusations of molestation by" Haas. J.H. said that Elaine "pressured [A.H.] about testifying against [Haas], and rehearsed his testimony prior to the trial." J.H. said that L.H. "was subjected to the same behavior" by Boyles and Elaine. J.H. said that A.H. told her Elaine promised him a new four-wheeler in exchange for testifying as he had been instructed, and he later received the four-wheeler. J.H. said that L.H. told her Elaine promised him a new Nintendo game system if he testified as instructed, and he later received the game system.

J.H. also averred that Boyles "pressed [J.H.] to admit that [Haas] had sexually molested" her, too. J.H. said that Elaine pressured her to testify and that Dodson pressured her "to say that I was a victim of

-11-

[Haas'] sexual advances[,] which was false and she knew it." J.H. alleged that Dodson "told [J.H.] she would take [her] on a shopping spree if [J.H.] lied about" Haas. J.H. also alleged that Elaine and Elaine's parents discussed trial testimony with J.H. despite being ordered not to do so, that they and Dodson warned J.H. "not to say anything that would hurt the Commonwealth's case," and that J.H. "would be in trouble if [she] said anything that contradicted [her] brothers' allegations." J.H. said that she "was told specifically to testify that [Ursula] had bribed [her] with tickets to an ice show into calling [Haas'] defense counsel about the allegations." J.H. insisted that Ursula "never tried to bribe [her] about [her] testimony"; rather, J.H. made the call at Haas' request "after [A.H.] told me that [Haas] had not molested him."

J.H. also averred that the prosecutor had been a friend of the family prior to Haas' arrest and that as a teenager, Elaine had babysat the prosecutor's children. After Haas' arrest, the prosecutor and his family took a vacation with Elaine and Haas' children. J.H. said that Elaine showed her a $25,000 check she received from a member of the prosecutor's family before trial began.

In her affidavit, Starling averred that she had reviewed the medical testimony from the trial and opined that the three physicians who examined the boys in 1994 lacked sufficient expertise to provide the opinions they gave.[4] She also asserted that the opinions Foster offered at trial "are no longer medically accepted." According to Starling, "[t]he science of the evaluation of child sexual abuse has evolved since these children were evaluated in 1994 and much of what was felt to be accurate at that time has changed today." She opined that "[o]nly when an examination is performed acutely ([i.e.,] within 48 to 72 hours of an alleged penetration) is an examiner able to definitively diagnose anal trauma." She also opined that children should not be examined for sexual abuse under anesthesia because sedation alters the appearance of the anus.

---

[4] At the time of Haas' first actual innocence petition, his counsel was unable to obtain the photographs taken during the examinations of A.H. and L.H., which limited his medical experts to reviewing the trial testimony. Haas' present counsel asserts that the photographs presented at trial ultimately were found in evidence storage of the Circuit Court of Powhatan County and the medical records were found in an offsite storage area of Virginia Commonwealth University, the successor to MCV.

-12-

Starling said that under current standards, the findings regarding rectal folds "are recognized as consistent with normal physiology and are seen commonly enough that they are not considered abnormal or the result of abuse." According to Starling, "a finding . . . diagnosed as a lack of anal folds is most likely to be a normal finding, a congenital condition known as diastatis ani." Similarly, she opined that "[a]nal fissures are very common in children and there are many medical explanations for anal fissures that are unrelated to sexual abuse. . . . [T]here is no means of definitively identifying from a non-acute physical examination how a fissure might have occurred." She also said that "[t]he concept of anal funneling as a consequence of sexual abuse" "never was widely adopted by U.S. child abuse physicians" "and it is no longer in use in the U.S." She also opined that, assuming that the photographs showed trauma, contrary to the testimony at trial "there would be no way to determine from which direction the trauma had originated." She also doubted that Ryland and Marcello "saw clear anal scarring" during L.H.'s examination because "[a]nal injuries typically heal with no visible scarring." Finally, Starling opined that "[a]nal diameter is variable . . . . It is not a parameter on which sexual abuse can be based."

Starling admitted, however, that she could not "comment on" what the doctors had seen because she had been unable to examine the photographs. She also stated that she could not "render an opinion to a reasonable degree of medical certainty whether these two boys had medical indications that could have been consistent with sexual penetration of the anus."

Arden averred that he reviewed the trial transcript, the children's affidavits, and the boys' medical records. Like Starling, he opined that the doctors who testified for the Commonwealth at trial "were not very experienced and that the forensic science of detecting child abuse has changed and improved significantly in the intervening years." Arden noted that "[n]one of the four doctors . . . explained how they would have ruled out non-sexual abuse explanations." According to Arden, "[b]ased on the information that was provided to the [circuit court], the conclusions . . . are superficial and likely incorrect." He agreed with Starling that an anal trauma examination should not be done under sedation because it "significantly alter[s] the muscle tone of the rectal sphincter, and can influence clinical observations. Any clinical findings observed under patient

-13-

sedation must be suspect and seriously questioned." Although he opined that "to a reasonable degree of medical probability, the physical findings offered during the trial . . . are insufficient to support a diagnosis of sexual abuse," like Starling he did not opine that the medical evidence ruled out the possibility.

The Commonwealth filed a motion to dismiss Haas' petition,[5] which this Court granted without ordering an evidentiary hearing by the circuit court. The Court found that Haas failed to prove the truth of A.H. and L.H.'s recantations by clear and convincing evidence.[6] *Haas v. Commonwealth,* No. 0984-10-2, slip op. at 11 (Va. Ct. App. Mar. 1, 2011) (unpublished). The Court further found that other evidence presented at trial corroborated A.H. and L.H.'s trial testimony. *Id.* at 12. Finally, the Court noted that the trial judge found the original medical testimony to be powerful evidence. The Court observed that Starling failed to state an opinion on whether the medical examination results were consistent with sexual abuse and that, although Arden stated the medical testimony was insufficient to support a finding of abuse, he did not examine the boys in 1994 or review the examination photographs. *Id.* at 12-13.

Haas appealed to the Supreme Court of Virginia, asserting that we abused our discretion by making evidentiary findings and dismissing his petition without ordering an evidentiary hearing by the circuit court under Code § 19.2-327.12. The Supreme Court affirmed our decision. *Haas v. Commonwealth*, 283 Va. 284 (2012). The Supreme Court noted that recantations generally are viewed with suspicion and skepticism, particularly in child sexual abuse cases. *Id.* at 292. The Supreme Court found that A.H. and L.H.'s trial testimony was "graphic and explicit" and that it was "abundantly corroborated" by other trial testimony, including Dodson's testimony that Haas admitted he had "screwed the kids." *Id.* at 293-94. The Supreme

---

[5] The Commonwealth proffered an affidavit from Detective Neal recounting the children's statements during the investigation that were consistent with their trial testimony, affidavits from Elaine and Dodson confirming their trial testimony and denying the claims in the children's affidavits, an affidavit from Boyles denying the children's accusations, an affidavit from the prosecutor's son admitting that he gave Elaine money without his father's knowledge because he felt sorry for her, and an affidavit from the prosecutor denying contemporaneous knowledge of the gift.

[6] Effective July 1, 2020, the applicable standard of proof was amended to a preponderance of the evidence. *Tyler v. Commonwealth*, 73 Va. App. 445, 461-62 (2021) (quoting 2020 Va. Acts chs. 993, 994).

Court reasoned that the physicians' affidavits proffered to support Haas' petition were entitled to little weight because those physicians did not examine the victims or the contemporaneous photographs. *Id.* at 294. The Supreme Court concluded that we did not abuse our discretion by declining to refer the petition to the circuit court for an evidentiary hearing. *Id.* at 295.

### III. Instant petition for a writ of actual innocence

Effective July 1, 2020, the General Assembly amended Code § 19.2-327.10 to permit the filing of multiple petitions seeking a writ of actual innocence. *Johnson v. Commonwealth*, 72 Va. App. 587, 595 (2020); 2020 Va. Acts chs. 993, 994. Haas filed the instant petition in this Court on July 30, 2020. He now asserts that his claim of actual innocence is supported by additional scientific evidence discrediting the medical evidence presented at trial, new affidavits from the children, and scientific evidence that he alleges supports the reliability of his children's recantations. He contends that this new evidence establishes by a preponderance of the evidence that no rational trier of fact would have found him guilty beyond a reasonable doubt. He claims that the only direct evidence of sexual abuse at the trial was his sons' testimony and the medical evidence; his sons have recanted, and the medical evidence is discredited. He argues that the indirect evidence of sexual abuse in the testimony from J.H., Elaine, Dodson, and Detective Neal is not credible.

### A. Children's recantations

The children's most recent affidavits, dated 2017, are substantially similar to those from October 2009. A.H. reiterated that Haas "never touched [him] in a sexual manner" and that Boyles "coached [A.H.] with answers that [he] was to give in court." A.H. said that Boyles told him that Haas had "admitted to her that he had molested" A.H. L.H. similarly said that "Boyles told [L.H.] that [Haas] had sexually molested" him. L.H. alleged that he "was brainwashed to lie about [Haas] by . . . Boyles." A.H. averred that his false testimony was partly due to medication he had been prescribed and his inadequate understanding of the trial's procedure or consequences. He noted that he has consistently recanted his trial testimony for twenty years. L.H. similarly noted that he has consistently recanted his trial testimony since 2008.

-15-

J.H. reiterated that "Boyles told me on her own initiative that [Haas] had sexually molested [her] brothers." She again averred that "Boyles also suggested to [her] several times that [Haas] had molested [J.H.] and that [she] should admit that." J.H. again explained that she testified falsely at trial because Elaine, Elaine's parents, and Dodson "pressured and coerced [her] into" doing so. She further alleged that "[o]ver the past couple of years, when [Elaine] was under the influence of alcohol, she has admitted to [J.H.] that she manipulated [the children] into testifying against" Haas. According to J.H., Elaine told her that "Boyles told [Elaine] that [Haas] had sexually abused [them]" and Elaine "pressured [the children] into testifying against [Haas] because she wanted the money and custody of the children."

In addition to the children's new affidavits, Haas proffered an affidavit from Dr. Maggie Bruck, a professor of psychiatry specializing in cognitive and developmental psychology. Bruck averred that at the time of trial, there was little scientific literature "about suggestibility and suggestive interview techniques." "Since that time," she continued, "there has been an explosion of relevant scientific studies and an emerging consensus among experts and researchers in the field." She described at length the subsequent research and resulting scientific conclusions about defects in prior child interview practices, current preferred practices, and the reliability of children's reports of abuse. Bruck asserted that, based on her review of the investigatory materials, trial testimony, subsequent affidavits, and other materials, A.H. and L.H. "were repeatedly subjected to a wide array of suggestive techniques by different interviewers who were highly biased to believe that [they] were abused." Bruck further opined that "with a high degree of psychological certainty[,] . . . L.H. and A.H.'s allegation of sexual abuse were [sic] unreliable and a product of suggestive coercive interviewing and therapy."

### B. New medical evidence

Haas proffered that the full medical records from the original trial, including the photographs taken during the 1994 examinations, have been recovered. In support of his petition, Haas submitted affidavits from physicians who reviewed those records and photographs. Notably, Haas proffered an affidavit from Foster, who testified on behalf of the Commonwealth at the original trial. Foster repeated Starling's earlier

statement from Haas' first petition that the standards for evaluation of child sexual abuse have changed since 1994 based on further research and clinical experience. Foster attested that she re-examined the medical records and photographs from the 1994 examinations of A.H. and L.H., and under current standards would reach different conclusions. Foster opined that "to a reasonable degree of medical certainty," A.H.'s "examination did not present physical findings that were supportive of anal penetration with the caveat that most physical exams in child abuse even with penetration have normal exams." Similarly, Foster asserted that the findings from L.H.'s examination "would no longer be considered suspicious for anal penetration under today's standard of care." Foster further stated that the findings from L.H.'s examination "do not specifically support an inference of penetrating sexual abuse in and of themselves." But, Foster acknowledged that neither boy's examination "rule[s] out sexual abuse."

Haas also proffered an affidavit from Dr. Lori Frasier, a pediatrician with experience in evaluating children and adolescents with concerns of sexual abuse. Frasier attested that although she was not suggesting "that the [original doctors'] medical opinion in 1994 was below the standard of care," "[t]here has been a change in the understanding of normal anal anatomy since [A.H. and L.H.] were examined in 1994." Based on her review of the examination photographs, Frasier asserted that under current standards, L.H.'s "examination would be considered completely normal, without any evidence of trauma, acute or remote." Frasier similarly asserted that A.H.'s examination "if performed today, would be considered entirely normal."

Haas also proffered an affidavit from Dr. Joyce Adams, another pediatrician with experience in evaluating children and adolescents who are suspected victims of sexual abuse. Adams averred that "the standards for evaluating pediatric sexual abuse cases have become more sophisticated, more reliable, and more accurate than 1994." She opined that based on her review of the medical records, photographs, and trial testimony, nothing "support[s] or even suggest[s] any medical indications of sexual penetration of the anus of either L.H. or A.H." and that "to a reasonable degree of medical certainty," "the photographs reveal no physical findings that are abnormal or suggestive of abuse." She specifically noted that the photographs and resulting conclusions in 1994 were affected by the decision to examine the boys under sedation and in a prone

-17-

position; Adams discussed how that decision undermined each of the factors underlying the doctors' conclusions that the boys had been sexually abused. Echoing Arden's 2010 affidavit, Adams also opined that the three doctors who examined the boys in 1994 lacked "extensive experience in evaluating children for suspected sexual abuse."

## C. Commonwealth's response

At this Court's direction, the Commonwealth filed a response to Haas' petition under Code § 19.2-327.11(C). In it, the Commonwealth argued that it is "questionable" whether the 2017 affidavits from A.H., L.H., and J.H. are material, asserting it is "unclear" if the statements contained in those affidavits are true. The Commonwealth noted that A.H. and L.H.'s 2017 affidavits are substantially similar to the affidavits proffered in support of Haas' first petition, which this Court found Haas had not proved to be true. The Commonwealth also noted that some of the statements in A.H. and L.H.'s 2017 affidavits are contradicted by other evidence in the record, such as Boyles' denial that she coached them and Elaine's denial that she promised anything to them in exchange for testifying against Haas. The Commonwealth claimed that L.H.'s denial of having been assaulted "is not based upon a specific recollection that nothing occurred." The Commonwealth proffered that during an interview on January 19, 2021, L.H. "indicated that he did not have a concrete memory of any assault, and that based upon his discussions with other individuals who have been abused, he believes he should have a strong memory of abuse if it occurred." The Commonwealth asserted that because of "inconsistencies" between A.H. and L.H.'s 2017 affidavits and other evidence in the record, an evidentiary hearing "may be warranted." The Commonwealth also asserted that unless J.H.'s 2017 affidavit is found to be true, it does not support a finding that Haas is actually innocent because many of her assertions contradict her trial testimony and her statement to the police investigator.

The Commonwealth further claimed it is "unclear" if the proffered evidence would prevent a rational trier of fact from finding Haas guilty beyond a reasonable doubt. The Commonwealth noted that the affidavits from Foster, Adams, and Frasier, averring that the findings from the physical examinations of A.H. and L.H. would not be considered abnormal under current standards, do not establish that Haas is actually

-18-

innocent. The Commonwealth also noted that Dodson's trial testimony that Haas admitted that he "screwed the kids" is not refuted by the new scientific evidence.

The Commonwealth asserted that it was necessary for the circuit court to determine the veracity of the affidavits from A.H., L.H., and J.H. Therefore, the Commonwealth requested that this Court exercise its discretion under Code § 19.2-327.12 and order the circuit court to determine the credibility and truthfulness of the affidavits from A.H., L.H., and J.H. The Commonwealth did not address the remaining factors required by Code § 19.2-327.11(A) to grant a writ of actual innocence, including that the proffered evidence be "'new' evidence," *Tyler v Commonwealth*, 73 Va. App. 445, 463 (2021) (quoting Code § 19.2-327.11(A)(iv)(a), (vi)(a)), and that the new evidence is not "merely cumulative, corroborative, or collateral[,]" *id.* at 466 (quoting Code § 19.2-327.11(A)(viii)).

### D. Haas' reply

Haas filed a brief in reply asserting that there is "not a shred of evidence remaining" to support his conviction. He noted that the new medical evidence before the Court differs from the evidence offered in support of his prior petition and affirmatively refutes the medical findings from the original trial. He further argued that Bruck's affidavit bolsters the consistent recantations from A.H. and L.H. Haas argued there was no basis for an evidentiary hearing because A.H. and L.H. have freely and consistently recanted their trial testimony multiple times. Haas conceded that courts generally view recantations with suspicion, and that both this Court and the Supreme Court were skeptical of A.H. and L.H.'s recantations in his first petition. However, Haas argued that the scientific research discussed in Bruck's affidavit establishes that false recantations in child sexual abuse cases are rare. Haas further noted that the re-evaluation of the medical evidence from trial bolsters the reliability of A.H. and L.H.'s recantations. Finally, Haas observed that the standard of proof for a writ of actual innocence has changed from "clear and convincing" to "a preponderance of the evidence" standard.

-19-

E.  Remand for factual findings

Upon consideration of the petition, response, reply, and record, this Court found that a resolution of the case required further development of the facts.  Therefore, we remanded the matter to the Circuit Court of Powhatan County under Code § 19.2-327.12 for the purpose of taking testimony under oath and subject to both cross-examination and the Rules of Evidence.  We directed the circuit court to certify findings on forty-one questions.  *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. June 17, 2021).

The circuit court received evidence on August 31 and September 1, 2021, including testimony of the various affiants.  Haas and the Commonwealth submitted a forty-two-page Joint Proposed Findings of Fact, which the circuit court adopted and incorporated as the findings of the circuit court.  In addition to adopting the findings of fact proposed by the parties, the circuit court made credibility findings regarding the witnesses it had observed.  The circuit court certified its findings to this Court on September 24, 2021.  Pertinent here, the circuit court found the following:

- A.H., L.H., and J.H., each testified, under oath, consistent with the affidavits submitted with Haas' petition for a writ of actual innocence in this case;

- A.H., L.H., and J.H., each testified that his or her trial testimony was false and was the result, at least in part, of influence exerted over the children by Boyles and Elaine;

- Neither Haas nor any other person coerced A.H., L.H., and J.H. to recant his or her trial testimony and each was doing so of his or her own free will;

- Other than the trial evidence, there was no evidence of prior acts of sexual abuse by Haas against any family members or any other person;

- Frasier meets the qualification standard in Virginia to testify as an expert regarding child sexual abuse and testified, under oath, consistent with her affidavit submitted with Haas' petition for a writ of actual innocence in this case;

- Frasier testified under oath, to a reasonable degree of medical certainty, that the examination findings and photographs from the medical examinations of A.H. and L.H. that were utilized at trial do not support a finding of sexual abuse;

- Frasier opined that, although the medical testimony in 1994 was within the pertinent standard of care at the time, in the intervening years, a general consensus in the field has developed that the examination findings regarding A.H. and L.H. do not support a finding of sexual abuse;

-20-

- Frasier testified that the current consensus was reached in 2016, and she is aware of no scientific literature that existed in 1994 that would have set forth the current consensus;

- Frasier is aware of no qualified "expert in the field of child sexual abuse pediatrics who in 1994 would have held an opinion that was consistent with the current general consensus";

- Frasier opined that "the 1994 examinations of [A.H. and L.H.] do not refute or establish that [either of them] suffered from anal abuse";

- Adams meets the qualification standard in Virginia to testify as an expert regarding child sexual abuse and testified, under oath, consistent with her affidavit submitted with Haas' petition for a writ of actual innocence in this case;

- Adams testified under oath, to a reasonable degree of medical certainty, that the examination findings and photographs from the medical examinations of A.H. and L.H. that were utilized at trial do not support a finding of sexual abuse;

- Based on the prevailing view in the medical community in 1994, Adams, if she had been called as a witness in 1994, would have opined that the examination findings were suggestive of sexual abuse; however, given the change in the general consensus of experts in the field, she does not presently hold that view;

- Adams testified that the current consensus was reached after 2010, and she is aware of no scientific literature that existed in 1994 that would have set forth the current consensus;

- Adams is aware of no "experts testifying as of 1994 who would have offered opinions consistent with" the current consensus of experts in the field;

- Adams opined that the 1994 examinations of A.H. and L.H. neither establish nor refute whether either of them suffered from sexual abuse;

- Bruck presently meets the qualification standard in Virginia to testify as an expert regarding a child's report of sexual abuse and any subsequent recantation, but that she would not have met the qualification standard in 1994;

- Bruck testified, under oath, consistent with her affidavit submitted with Haas' petition for a writ of actual innocence in this case and specifically opined that the children's trial testimony was "the product of suggestive therapy" and should be considered "unreliable";

- Bruck testified that there was no scientific literature that existed in 1994 that would have supported her present opinions but that such literature exists today;

- Given that her opinions are based on research advances in the field, Bruck does not believe that there were qualified experts in 1994 who could have given, consistent with scientific consensus, all of the opinions she put forward in her affidavit submitted with Haas' petition for a writ of actual innocence in this case;

- Foster testified, under oath, consistent with her affidavit submitted with Haas' petition for a writ of actual innocence in this case, and specifically opined that, although her trial testimony was consistent with the relevant standard of care when she testified in 1994, such opinions are inconsistent with the current general consensus in the field;

- Foster testified under oath, to a reasonable degree of medical certainty, that her present opinion is that the examination findings and photographs from the medical examinations of A.H. and L.H. that were utilized at trial do not support a finding of sexual abuse;

- Foster explained the change in her opinion, noting that, based on continued research in the field, "*none* of the physical findings that served as a basis for her medical testimony against Michael Haas in 1994 are regarded today as a sign of sexual abuse" and that the examination findings regarding A.H. and L.H. do not support a finding of sexual abuse;

- Foster testified that the current consensus evolved over time with portions of the consensus developing as early as 2007 and other portions of the consensus being accepted in 2016;

- Foster opined that the 1994 examinations of A.H. and L.H. neither establish nor refute whether either of them suffered from sexual abuse; and

- Every witness had an "appropriate demeanor" while testifying and "testified in a sincere and conscientious way."

### F.  Further proceedings

Having received the findings of the circuit court, we directed the parties to file supplemental briefing. *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Oct. 22, 2021).  The briefing order permitted the parties to "address[] any issues either party believes have been raised by the supplementation of the record by the circuit court" and instructed the parties to address in their respective briefs the following questions:

> (1) The preclusive effect, if any, of the rulings of this Court in *Haas v. Commonwealth*, No. 0984102 (Va. Ct. App. Mar. 1, 2011), and of the Supreme Court of Virginia in *Haas v. Commonwealth*, 283 Va. 284 (2012);
>
> (2) The effect of the recantation by one medical expert who testified at trial on the permissible weight a rational factfinder may give to the trial testimony of other medical witnesses who have not recanted; and
>
> (3) The significance of the fact that the recanting medical expert's new testimony does not establish that no crime occurred, but rather, only that she no longer holds the opinion she gave at trial to the requisite level of probability.

*Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Oct. 22, 2021).  Haas was directed to file his brief no later than November 23, 2021.  *Id.*  The Commonwealth was directed to file its brief within twenty-one days of

-22-

the filing of Haas' brief with Haas having permission to file a reply brief within fourteen days of the filing of the Commonwealth's brief.

Consistent with the Court's order, Haas filed his supplemental brief on November 23, 2021.  On December 8, 2021, the Commonwealth filed an unopposed motion seeking an extension of the briefing deadline until December 29, 2021.  In a December 10, 2021 order, the Court granted that motion.  *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Dec. 10, 2021).  On December 29, 2021, the Commonwealth filed another unopposed motion seeking an extension of the briefing deadline until January 5, 2022.  That same day, the Court entered an order granting the requested extension.  *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Dec. 29, 2021).  Less than ten minutes before 5:00 p.m. on January 5, 2022, the Commonwealth filed yet another request for an extension of the briefing deadline.  The Court denied that motion by order entered on January 6, 2022.  *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Jan. 6, 2022).

On January 7, 2022, the Commonwealth lodged with the Clerk of this Court a supplemental brief and filed a motion seeking "permission to file the [lodged brief] out of time."  On January 10, 2022, the Court denied the Commonwealth's motion.  *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Jan. 10, 2022).  In addition to denying the motion, the order informs the parties that "[t]he Court will proceed to schedule oral argument in this matter" and that, "[b]ecause the Commonwealth timely filed its original brief in this matter, both parties will be permitted to participate in oral argument."

On January 19, 2022, Haas lodged with the Clerk of this Court a document entitled "Petitioner's Reply Brief."  As noted above, the Commonwealth did not timely file a supplemental brief in this matter, and the Court denied the motion in which the Commonwealth sought leave to file such a brief out of time.  Accordingly, there is no brief to which petitioner properly could file a reply.  Accordingly, the document

-23-

entitled "Petitioner's Reply Brief" is not properly before the Court and has not been considered by the Court in resolving this matter.[7]

We set oral argument in this matter for February 23, 2022. On February 7, 2022, the Commonwealth filed an unopposed motion seeking to continue the oral argument citing the change in counsel following the election of a new Attorney General and the need to be prepared to address the procedural questions raised by the Court in its briefing order. In the motion, counsel for the Commonwealth noted that, in 2022 while the Commonwealth was represented by the prior administration, the Commonwealth had, for the first time, taken the position that Haas was entitled to a writ of actual innocence. In seeking the continuance, "the Commonwealth reaffirm[ed] its position . . . that this Court should grant the Petitioner a writ of actual innocence."[8] The Court granted the requested continuance, and oral argument was rescheduled for March 24, 2022.

On March 18, 2022, the parties filed a "Joint Motion to Expand the Record." In the motion, the parties sought to place before the Court affidavits and/or interview statements of the medical experts other than Foster who testified against Haas at the 1994 trial. The Court granted the motion by order entered on

---

[7] On January 21, 2022, Haas lodged with the Clerk of this Court an amended version of the document entitled "Petitioner's Reply Brief." For the same reasons as the initial version of "Petitioner's Reply Brief," that document is not properly before the Court and has not been considered by the Court in resolving this matter.

[8] Although we appreciate the Attorney General's concession, it is not dispositive of the issues before us. Our review of an actual innocence petition necessarily "begin[s] with the presumption that [the petitioner]'s conviction, the result of a full criminal trial that has been affirmed on direct appeal, is correct." *Tyler*, 73 Va. App. at 459. A concession by the Attorney General does not, standing alone, overcome this presumption. *Copeland v. Commonwealth*, 52 Va. App. 529, 531-32 (2008). Furthermore, as will be discussed more fully below, a petitioner must prove, among other things, that "the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt[.]" Code § 19.2-327.11(A)(vii). In light of this statutory language, "it is not enough for [a petitioner] to convince us that some, many, or even most rational factfinders would have acquitted him if presented with the version of events laid out in [the petition] along with the evidence adduced at trial. He must prove that *every* rational factfinder would have done so." *Tyler*, 73 Va. App. at 469. Because there will be circumstances where a rational factfinder can and will disagree with even the Attorney General, the Attorney General's conclusion that no rational factfinder would have convicted petitioner, while entitled to consideration and part of our decision-making calculus, is insufficient to merit relief on its own.

-24-

March 23, 2022. *Haas v. Commonwealth*, No. 0878-20-2 (Va. Ct. App. Mar. 23, 2022). As summarized by the parties, the documents which are now part of the record establish that the pertinent medical witnesses "each admit that he or she lacks the qualifications or experience to contradict or even question the 2021 opinions offered by the experts in child sexual abuse pediatrics, Drs. Foster, Adams and Frasier" and that each one is unfamiliar with the current standard of care in the field and has no knowledge as to whether and how the standard has changed since 1994.

ANALYSIS

### I. Original jurisdiction

Unlike cases we hear under the grant of appellate jurisdiction found in Code §§ 17.1-405 and -406, petitions for writs of actual innocence fall within our original jurisdiction. *Phillips v. Commonwealth*, 69 Va. App. 555, 562 (2018) (citing Code § 19.2-327.10). As a result, our consideration of a petition does not involve review of a judgment rendered by another tribunal, but rather, "presents one of the rare situations in which the General Assembly has charged an appellate court with engaging in factual evaluation." *Dennis v. Commonwealth*, 297 Va. 104, 127 (2019). Accordingly, we have "the same authority to weigh and evaluate documentary and physical evidence as a trial court would have." *Haas*, 283 Va. at 292. "This remains true even in those cases where we remand the matter to the circuit court for 'further development of the facts' pursuant to Code § 19.2-327.12" because the role of the circuit court in such cases "is to assist this Court in our factfinding function—not to supplant it." *Tyler*, 73 Va. App. at 459 n.11 (citation omitted).

### II. Preclusive effect and petitions for writs of actual innocence

In general, our legal system "give[s] to every litigant *one*, *and only one*, opportunity of presenting his case to the jury or before the court, and when this has been had, the results of the trial will not usually be d[i]sturbed[.]" *Harris v. Wall*, 144 Va. 774, 778-79 (1925) (emphasis added). Whether denominated *res judicata*, claim preclusion, issue preclusion, or law of the case, the need for finality of judgments has led to doctrines that prevent litigants from attempting to relitigate questions that have been fully litigated and decided by courts in the normal course. Thus, the general rule is that, after a trial has occurred and direct

appeals have been exhausted, the result is "a final judgment" that "is conclusive of all rights, questions, and facts in issue as to the parties and their privies." *Winborne v. Doyle*, 190 Va. 867, 871 (1950). If these general rules applied to this proceeding, Haas would be unable to challenge the conclusion, affirmed on appeal, that he committed the crimes for which he was convicted in 1994.

By definition, the actual innocence statutes represent a limited exception to these general rules. If a petitioner's claim falls within the statutory parameters, he or she may challenge the previous findings of guilt.[9] If a petitioner is able to carry his or her burden of proving the statutorily mandated facts, he or she is entitled to a writ of actual innocence, to an order vacating any covered convictions, and to a circuit court order expunging said convictions. Code § 19.2-327.13.

Haas availed himself of this exception to the general rule when he filed his initial petition for a writ of actual innocence in 2010. Much like the instant petition, Haas based his claim on affidavits from his children recanting their trial testimony and on affidavits from medical experts criticizing the medical testimony underlying his 1994 convictions. Both this Court and the Supreme Court found that Haas' petition failed to meet the then prevailing standard for a writ of actual innocence.

The Supreme Court held that the evidence Haas proffered by way of affidavit was immaterial[10] or otherwise failed to meet the requirements of the actual innocence statutes to be considered as a basis for relief. Regarding the children's recantations, the Supreme Court emphasized that courts must view recantations with "great suspicion" with such skepticism heightened when the recantation comes from a child

---

[9] We note that the post-judgment challenge authorized by the actual innocence statutes is not a new trial. In an actual innocence proceeding, the findings at the prior trial must be considered and may not be ignored or otherwise disregarded. *In re Brown,* 295 Va. 202, 228-29 (2018) (recognizing that an actual innocence proceeding does not focus solely on the new evidence advanced by the petition or require the Commonwealth to reprove its case, but rather, requires review of, among other things, "all of the evidence in the aggregate—including the testimony and exhibits at the original trial, any previous records from the original case, the facts proffered by the petitioner, the factual proffers in the Commonwealth's response, [and] any records of pertinent evidentiary hearings" (footnote omitted)).

[10] In finding much of the proffered evidence immaterial, the Supreme Court reiterated that, to be material under the actual innocence statutes, proffered evidence must be "true." *Haas*, 283 Va. at 293.

victim of sexual abuse. *Haas*, 283 Va. at 292 (citation omitted). In explaining its conclusion, the Supreme Court reiterated its holding from *Carpitcher v. Commonwealth*, 273 Va. 335 (2007), that "[u]nless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness herself." *Haas*, 283 Va. at 292 (quoting *Carpitcher,* 273 Va. at 346).

The Supreme Court also rejected the medical affidavits submitted by Haas. The Supreme Court noted that the "affidavits were entitled to little weight because the physicians giving the affidavits, unlike those who testified, never examined either the injuries inflicted on the victims or the contemporaneous photographs showing those injuries." *Id*. at 294. The Supreme Court also concluded that the medical affidavits did not meet other requirements for consideration, concluding that the proffered evidence "was not newly discovered and such as to have been unavailable to the petitioner, by the exercise of due diligence, before the expiration of twenty-one days following the entry of the final order of conviction" and was "merely cumulative or corroborative of the [medical] defense evidence rejected by the trial court." *Id.*

Prior to July 1, 2020, the decision on these issues would have been the end of the matter because a petitioner was entitled to file one, and only one, petition for a writ of actual innocence. In 2020, however, the General Assembly amended the actual innocence statutes to allow for the filing of more than one petition. *Johnson*, 72 Va. App. at 595 (explaining the effect of the statutory amendments). This is the first case in which we have been called upon to address the preclusive effect, if any, of a decision of the Supreme Court that proffered recantations are immaterial or that certain other types of evidence are not newly discovered, are cumulative, and are not credible.

Haas argues that the Supreme Court's prior decision carries no preclusive effect for three reasons. First, he contends that the current affidavits, from both the children and medical experts, are different in kind from those that were rejected previously. He notes that the children's affidavits are now bolstered by Bruck's testimony and that part of the reason the Supreme Court found them wanting in the past was the children's trial testimony was corroborated by the medical testimony at trial, which has now been called into question not just by the new reviewing medical experts' affidavits, but by the affidavits of Foster and the other

-27-

MCV-affiliated physicians who testified for the Commonwealth at trial but who now effectively seek to diminish if not negate their trial testimony.

Second, Haas argues that the medical affidavits in 2010 were undermined by the temporary loss of the original examination records, preventing his then experts from reviewing them. His current experts' opinions suffer from no such deficiency. Furthermore, he notes that, on this record, it is uncontradicted that the general consensus of the medical community regarding the significance of the physical findings testified to at trial has evolved since 1994 and that that consensus is also different than it was in 2010.

Finally, he notes the prior findings of inadequacy by both this Court and the Supreme Court occurred when his burden was to prove the statutory factors by clear and convincing evidence as opposed to the more lenient preponderance of the evidence standard that currently applies, *see Tyler*, 73 Va. App. at 461-62 (explaining the lessening in the quantum of proof necessary to obtain a writ and its effect), and when the proffered evidence had to establish that no rational factfinder "could" as opposed to "would" have found him guilty beyond a reasonable doubt. *see In re Watford*, 295 Va. 114, 123-24 (2018) (explaining the changing of the standard from "could" to "would" and its effect).

The confluence of all of these circumstances leads us to conclude that the prior decision of the Supreme Court does not preclude us from addressing the efficacy of the affidavits underlying Haas' current petition. This is not to say that there will not be instances in which a prior decision of the Supreme Court or a panel of this Court regarding an actual innocence petition will be entitled to preclusive effect in a proceeding regarding a subsequently filed petition.[11] Rather, we conclude that, in this case, the change in the statutory standards, the evolution of the general medical consensus, the reasoned retraction of the medical testimony that served as corroboration, and the new medical evidence, combine to merit a fresh look at Haas' claims under the statutory scheme now in effect. Having concluded that the Supreme Court's prior decision does not

---

[11] By way of example, Haas conceded at oral argument in this Court that a denial of a petition likely would be entitled to preclusive effect if a subsequently filed petition was to be decided under the same statutory standards and was based on affidavits that simply restated what had been stated previously with no new event or evidence present that might call the prior ruling into question.

-28-

preclude our consideration of any of the arguments advanced by Haas, we now turn to addressing those claims on the merits.

### III. Haas' burden and the evidence

A person seeking a writ of actual innocence faces a daunting task; the process begins not with a presumption that a petitioner is innocent, but rather, that he or she is guilty. *Tyler*, 73 Va. App. at 459. To overcome this presumption, Haas bears the burden of "proving by a preponderance of the evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of § 19.2-327.11[.]" Code § 19.2-327.13. Thus, he must prove that the evidence on which his petition is based "was previously unknown or unavailable to [him] or his trial attorney of record at the time the conviction . . . became final in the circuit court[,]" Code § 19.2-327.11(A)(iv)(a); "the date . . . the previously unknown or unavailable evidence became known or available to the petitioner and the circumstances under which it was discovered[,]"[12] Code § 19.2-327.11(A)(v)(a); "that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before" his conviction became final in the circuit court, Code § 19.2-327.11(A)(vi)(a); "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt[,]" Code § 19.2-327.11(A)(vii); and "that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral[,]" Code § 19.2-327.11(A)(viii). "Because the General Assembly has mandated that a petitioner must prove 'all of the allegations contained in clauses (iv) through (viii) of subsection A of 19.2-327.11,' Code § 19.2-327.13, a failure of [Haas] to establish any one of the required facts requires us to dismiss his petition." *Tyler*, 73 Va. App. at 463.

---

[12] For each of the new pieces of evidence upon which Haas relies, he has averred when he learned of the information and the circumstances by which he learned of the information. The Commonwealth contests neither the dates Haas claims to have learned the information nor the circumstances of his discovery of that information. Nothing in the record even suggests that Haas' averments on these issues are anything other than accurate. Accordingly, we conclude that this factor is satisfied by the record without the need for further development or discussion.

A. Affidavits as new evidence

As we explained in *Tyler*, "[p]etitions for actual innocence require 'new' evidence." *Id.* Accordingly, the evidence proffered by Haas must have been "unknown or unavailable to [him] or his trial attorney . . . at the time the conviction . . . became final in the circuit court[,]" Code § 19.2-327.11(A)(iv)(a), and represent evidence that "could not, by the exercise of diligence, have been discovered or obtained before" his conviction became final in the circuit court[,] Code § 19.2-327.11(A)(vi)(a). A review of the evidence Haas has put forward in support of his current petition demonstrates that the evidence constitutes new evidence as defined by the actual innocence statutes.

Beginning with the affidavits of A.H., L.H., and J.H., we note that none of them, whether filed with the 2010 petition or the present petition, existed within twenty-one days of the 1994 convictions becoming final in the circuit court. Accepting that the substance of the affidavits was known to the children in 1994, the record makes clear that that substance *from* the children was not available to Haas at that time. At trial, he offered a competing narrative and called into question the children's contrary testimony, but the children's current version of events was not forthcoming. Furthermore, the record establishes that the children's current version could not have been discovered in 1994 no matter the efforts of Haas or his counsel. As the circuit court found on remand, there is substantial reason to believe that the trial testimony given by the children was the product of coercion and suggestive encounters with adults (to include Boyles) and that no efforts by Haas or his counsel would have resulted in the children contradicting their trial testimony in 1994. Accordingly, we conclude that the affidavits submitted by A.H., L.H., and J.H. constitute new evidence for the purposes of Code § 19.2-327.11(A)(iv)(a) and Code § 19.2-327.11(A)(vi)(a).

For similar reasons, we conclude that Foster's affidavit and the supporting affidavits and statements from the other MCV physicians who testified at trial are also new evidence within the meaning of the actual innocence statutes. The present statements of expert opinion from these fact witness experts were not available in 1994 because Foster and the other physicians did not hold their present opinions when they testified in 1994. No amount of diligence by either Haas or his counsel in 1994 could have changed that fact

because it is undisputed that the opinions changed because of a change in the general consensus in the medical community regarding the significance of the physical findings that did not finalize until 2016. Accordingly, we conclude that the affidavits and statements submitted by or on behalf of Foster and the other MCV physicians who testified in 1994 constitute new evidence for the purposes of Code § 19.2-327.11(A)(iv)(a) and Code § 19.2-327.11(A)(vi)(a).

Finally, we conclude that the affidavits of the reviewing experts, Frasier, Adams, and Bruck, also constitute new evidence within the meaning of the actual innocence statutes. Although, as the Supreme Court previously noted, Haas had medical experts at trial, *Haas*, 283 Va. at 294, those experts were not able to offer the opinions currently being offered by Frasier, Adams, and Bruck. First, Frasier, Adams, and Bruck's opinions are not challenged by Foster and the other MCV physicians, but rather, are bolstered by the change in the opinions of Foster and the other MCV physicians. Furthermore, the circuit court found that the opinions of Frasier, Adams, and Bruck could not have been offered in 1994 because neither they, nor any qualified expert, could have offered such opinions given the state of medical knowledge at the time. Underlying the circuit court's finding on remand in this regard was its conclusion that the medical consensus underpinning the new opinions simply did not exist in 1994. No evidence in this record contradicts that finding. Accordingly, we conclude that the affidavits submitted by Frasier, Adams, and Bruck constitute new evidence for the purposes of Code § 19.2-327.11(A)(iv)(a) and Code § 19.2-327.11(A)(vi)(a).

### B. Evidence as merely cumulative, corroborative, or collateral

For us to consider the affidavits and other evidence proffered by Haas, he also must establish that they do not constitute evidence that "is . . . merely cumulative, corroborative, or collateral." Code § 19.2-327.11(A)(viii)(a). We conclude that he has carried this burden.

### i. Merely cumulative

"Cumulative [evidence] is repetitive [evidence] that restates what has been said already and adds nothing to it. It is [evidence] of the same kind and character as that already given." *Bush v. Commonwealth*, 68 Va. App. 797, 809-10 (2018) (quoting *Massey v. Commonwealth*, 230 Va. 436, 442 (1985)). "If it is

-31-

dissimilar in kind, it is not cumulative, in a legal sense, though it tends to prove the same proposition." *Wynne v. Newman*, 75 Va. 811, 817 (1881). Applying this definition, the proffered evidence is not merely cumulative.

We note that the affidavits and statements of A.H., L.H., J.H., Foster, and the other MCV physicians who testified at trial in a very real sense seek to negate what each of them said at trial in 1994. By definition, if the trial testimony was not cumulative, the affidavits of trial witnesses seeking to undo their testimony cannot be cumulative. Furthermore, as noted above, we are required to consider all of the trial testimony and compare it to any new evidence. *See In re Brown v. Commonwealth*, 295 Va. 202, 229 (requiring consideration of "[t]his admixture of old and new evidence" in actual innocence proceedings). The new evidence from each trial witness certainly provides a basis for reconsideration of the trial testimony of each of them. Because the particular basis could not be supplied by anyone other than the original trial witness, the affidavits "add[,]" *Bush*, 68 Va. App. at 810, to what we must consider, and thus, are not merely cumulative.

Similarly, the evidence from the new reviewing experts is not merely cumulative. As found by the circuit court, the evidence offered by each would not have been available in 1994 because the medical consensus upon which they are based did not exist at that time. Thus, while consistent with the position taken by Haas in 1994, the opinions are not cumulative of the evidence he offered at trial.[13] Accordingly, we conclude that all of the evidence upon which Haas now relies is not "merely cumulative" for the purposes of Code § 19.2-327.11(A)(viii)(a).

ii. Merely corroborative

In general,

> [c]orroborative evidence is such evidence as tends in some degree, of its own strength and independently, to support some essential allegation or issue . . . testified to by the witness whose evidence is sought to be corroborated . . .; and

[13] Our conclusion that the evidence here is not merely cumulative turns on the change in the medical consensus, not the difference in the identity of the experts. Different experts offering "new" opinions may still be "merely cumulative" for the purposes of Code § 19.2-327.11(A)(viii)(a) if those opinions are not tied to an intervening change in the state of the relevant field of expertise, but rather, represent nothing more than a different expert's view of the case. *See Haas*, 283 Va. at 294.

-32-

> such corroborating evidence must, of itself, without the aid of any other evidence, exhibit its corroborative character by pointing with reasonable certainty to the allegation or issue which it supports, and such evidence will not be material unless the evidence sought to be corroborated itself supports the allegation or the point in issue.

*Commonwealth v. Proffitt*, 292 Va. 626, 638 (2016) (quoting *Davies v. Silvey*, 148 Va. 132, 138 (1927)). It "is evidence that does not emanate from the defendant's mouth, does not rest wholly upon the defendant's credibility, but . . . adds to, strengthens, and confirms [the] defendant's testimony." *Bush*, 68 Va. App. at 810 (quoting *Massey*, 230 Va. at 443).

In determining whether evidence is "merely . . . corroborative" within the meaning of Code § 19.2-327.11(A)(viii)(a), it is important that we view the question at the appropriate level of abstraction. After all, Haas has consistently maintained he did not commit the offenses and so testified at trial. We can conceive of no evidence that he might advance in a petition for a writ of actual innocence that does not, in some sense, corroborate that basic claim. Thus, if viewed at that level of abstraction, any evidence he has offered or might have offered could be viewed as corroborative.

Such a construction of the statute is obviously absurd. Accordingly, our review of whether evidence is "merely . . . corroborative" within the meaning of Code § 19.2-327.11(A)(viii)(a) must be undertaken at a more granular level. Accordingly, we address whether the new evidence is merely an echo of Haas' claims or provides a substantial basis beyond his saying so to advance his claim of innocence.

The proffered evidence here more than meets that test. Although supportive of Haas' claim of innocence, the recantation of the trial testimony of both the children and the Commonwealth's medical witnesses do not simply echo that claim or the trial evidence on which he relied to support that claim. In raising doubt about the evidence the factfinder relied upon to convict, the new evidence advances Haas' claims of innocence without, in any way, depending on his testimony or evidence at trial. Thus, it is not "merely . . . corroborative" within the meaning of Code § 19.2-327.11(A)(viii)(a).

Similarly, the new expert opinion evidence Haas proffers is not dependent on his claims of innocence.

-33-

Although the new medical evidence regarding child suggestibility and the evolving consensus regarding whether the physical examination findings were indicative of sexual abuse supports Haas' claim of innocence, they are not an echo of either the claim or the previous evidence that supported it, but rather, a new and wholly independent basis for the claim. Haas, as a layperson, was and remains unqualified to offer such opinion testimony himself; nor could any expert, because the general medical consensus in the field did not support it in 1994. Accordingly, we conclude that all of the evidence upon which Haas now relies is not "merely . . . corroborative" for the purposes of Code § 19.2-327.11(A)(viii)(a).

### iii. Merely collateral

Evidence is collateral if it is "incapable of affording any reasonable presumption or inference on matters in issue[.]" *McGowan v. Commonwealth*, 274 Va. 689, 695 (2007) (quoting *Bunting v. Commonwealth*, 208 Va. 309, 314 (1967)). It "is evidence 'from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation.'" *Bush*, 68 Va. App. at 810 (quoting *Helmick v. Commonwealth*, 38 Va. App. 558, 564 (2002)).

The evidence upon which Haas now relies is not merely collateral. All of the evidence offered goes to whether the children were sexually assaulted as alleged, whether Haas committed any such assaults, and/or the reliability of the evidence upon which the factfinder based its decision to convict Haas in 1994. These *are* matters at issue in this proceeding. Accordingly, we conclude that all of the evidence upon which Haas now relies is not "merely . . . collateral" for the purposes of Code § 19.2-327.11(A)(viii)(a).

### C. Evidence proving no rational trier of fact would have found guilt beyond a reasonable doubt

The last hurdle faced by Haas is to convince us, by a preponderance of the evidence, that the new evidence upon which he relies "is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt[.]" Code § 19.2-327.11(A)(vii). This statutory language

> direct[s] us to examine the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial. Thus, we are required to look beyond whether the evidence is sufficient to sustain the conviction; we

must also examine the likelihood of a reasonable juror finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly considered.

This probabilistic approach still places a considerable burden upon the petitioner. It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt. Rather, the petitioner must prove . . . that *no* rational trier of fact would have found proof of guilt beyond a reasonable doubt. In other words, a petitioner's evidence must do more than establish the theoretical possibility that a rational fact finder would choose to acquit; it must establish such a high probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty.

*Watford*, 295 Va. at 124 (internal quotation marks, citations and footnotes omitted).[14]

Haas argues that the recantation affidavits of the children and the medical witnesses, coupled with the new medical expert evidence, and the circuit court's credibility findings on remand require we find that he has met his burden. His argument in this regard suffers from a flawed premise.

Underpinning Haas' argument is his assumption that the circuit court's findings of credibility regarding the current positions of the trial witnesses reduces the value of their trial testimony to a nullity deserving of no consideration in our calculus. Such a view is incorrect.[15] As the Supreme Court has advised, our review requires a weighing of all of the evidence, both the newly proffered as well as the evidence that led to the convictions at trial. *Brown*, 295 Va. at 228-29. Thus, we must consider both the circuit court's finding that the recantation affidavits are credible *and* the original factfinder's conclusion regarding the

_____

[14] Prior to 2013, the actual innocence statutes required a petitioner to prove no rational factfinder "could" have found guilt beyond a reasonable doubt as opposed to the more lenient "would" in the current statutes. Under the "could" standard, "a petitioner [was required] to prove that the evidence was insufficient [and] to eliminate the possibility that he could have been convicted. In other words, the 'could' standard effectively required that a petitioner prove his innocence beyond any reasonable doubt." *Watford*, 295 Va. at 123. As noted above, the current "would" standard imposes less of a burden.

[15] The finding of the circuit court that the trial witnesses' current version of events is credible is the determination of *a* factfinder. It does not follow that *every* factfinder would reach the same conclusion when considering other evidence that was not before the circuit court on remand, *i.e.*, all of the original trial evidence and testimony, including the witness' appearance and demeanor. *Tyler*, 73 Va. App. at 471 n.17 (recognizing that "even if *a* factfinder on remand conclude[s] that it believe[s the] latest version of events, such a finding does not compel the conclusion that *every* factfinder would" do so).

original trial testimony, "which was deemed credible and compelling by a rational factfinder after being subjected to cross-examination and other evidence[.]" *Tyler*, 73 Va. App. at 470. Contrary to Haas' argument, the circuit court's recent credibility findings no more require us to grant him the relief he seeks than the original factfinder's rejection of his claims requires us to deny that relief. Rather, in our role as factfinder, we must weigh the competing credibility findings against each other with all of the other evidence. *See id.* at 469 (recognizing that "factfinders are called upon to resolve conflicting versions of events in trial courts on a near daily basis" and that such conflicting evidence does not preclude a factfinder from deciding which conflicting version of events to believe).

Although we disagree with the premise underlying Haas' argument, we ultimately agree with his conclusion—that the new evidence is material and that it is more likely than not that "no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt[,]" Code § 19.2-327.11(A)(vii), if presented with all of the evidence, both old and new. We reach this conclusion not by rejecting out of hand the trial evidence, but rather, after weighing it against all of the evidence. The recantations and associated explanations of Foster and the other MCV physicians who testified at trial, the evidence regarding the new medical consensus completely undermining the corroborative force of the physical examination findings that were crucial to the original factfinder's guilt determination, the entirety of the new expert evidence, and the affidavits of the children not only recanting their trial testimony, but explaining why and how they came to give that testimony, coupled with the circuit court's finding on remand and the Commonwealth's concession, lead us, as factfinder, to conclude that it is more likely than not that "no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt[.]" Code § 19.2-327.11(A)(vii).

In reaching this conclusion, we would be remiss if we did not address one additional piece of inculpatory evidence from the 1994 trial—Dodson's testimony that Haas drunkenly confessed to her that he "screwed the kids[.]" We note that, in rejecting Haas' initial petition for a writ of actual innocence, the Supreme Court noted the testimony corroborated the children's trial testimony and that Dodson had reiterated that testimony in an affidavit filed in response to Haas' initial petition. *Haas*, 283 Va. at 294.

Haas offers a plethora of reasons to not credit Dodson's testimony, but they all amount to credibility attacks that were made at the 1994 trial and rejected by the factfinder. We do not displace that credibility determination, but rather, it becomes part of the "admixture of old and new evidence[,]" *Brown*, 295 Va. at 229, that we must consider. There is little doubt that crediting Dodson's testimony that Haas confessed combined with other trial evidence would allow a rational factfinder considering both the new and old evidence to conclude that the evidence was *sufficient* to support Haas' convictions. As noted above, however, sufficiency is no longer the standard. For all the reasons stated above, we are convinced by a preponderance of the evidence that no rational factfinder considering *all* of the evidence, including Dodson's testimony, would find beyond a reasonable doubt that Haas committed the offenses. Accordingly, we conclude that he has met his burden and is entitled to a writ of actual innocence.

## CONCLUSION

For the foregoing reasons, this Court grants Haas' petition and issues a writ of actual innocence based on non-biological evidence, vacating the challenged convictions. If there is no appeal from this judgment to the Supreme Court of Virginia, the Clerk shall forward a copy of this writ to the Circuit Court of Powhatan County, where an order of expungement shall be entered immediately regarding the offenses at issue.

This order shall be published.


A Copy,

Teste:

A. John Vollino, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk